PETTENGILL, ANDREWS & CO.

*vs.*

RANGELEY LIGHT & POWER COMPANY, and CHARLES C. BENSON,
Trustee.

JAMES H. KERR *vs.* SAME.

Androscoggin.   Opinion March 25, 1912.

*Trustee process.   Executory Contracts.   Corporate Officers.   Evidence.*

One is not chargeable as trustee for the price of bonds on his breach of an
executory contract to buy them.

On trustee process, evidence *held* insufficient to show that the alleged trustee
was indebted to the principal defendant.

The treasurer of a corporation cannot be charged under trustee process for
its property in his official custody.

On Report.   Trustee discharged.

. Two actions of assumpsit, in each of which the principal defend-
ant was defaulted, and the cases reported to the Law Court to
determine the liability of the trustee.

The cases are stated in the opinion.

*Geo. C. & H. L. Webber,* for Pettengill, Andrews & Co.
*Bisbee & Parker, and Harrie L. Webber,* for James H. Kerr.
*McGillicuddy & Morey, and White & Carter,* for trustee.

SITTING: WHITEHOUSE, C. J., CORNISH, KING, BIRD, HALEY,
HANSON, JJ.

WHITEHOUSE, C. J.   The former of the above named cases is an
action to recover for the price of material furnished to the defend-
ant corporation.   The defendant has been defaulted for $865.82
and interest.

The latter is an action brought to recover the contract price for extra labor and materials and for excavating a pipe trench and building a dam for the defendant's power station. The defendant has been defaulted for $6,926.61.

The cases are reported to the Law Court upon the same evidence to determine the liability of the trustee upon the disclosure of the trustee, the allegations of the respective plaintiffs and the evidence.

The alleged trustee Charles C. Benson, filed a disclosure in each case alleging that at the time of the service of the writ upon him in that case, he had not in his hands and possession any goods, effects or credits of the defendant corporation and thereupon submitted himself to examination on oath.

The plaintiff in each case filed a statement alleging that C. C. Benson named as trustee, purchased of the Rangeley Light & Power Company, the defendant corporation, bonds issued by that company of the par value of $30,000 agreeing to pay therefor the sum of $27,000, being at the rate of 90 cents on the dollar; that in pursuance of such purchase Benson took delivery of the bonds and paid the sum of $10,000 on account thereof; that there is still due from Benson to the defendant company on account of the purchase of these bonds, the sum of $17,000; that Benson agreed with the defendant company to purchase on the same terms the remainder of the bonds issued by the defendant company of the par value of $5000 in the event that the sum of $27,000 did not prove sufficient in amount to install and finish the defendant's plant then in process of construction and "that the said Benson, the alleged trustee has not carried out the agreements or any of them hereinbefore recited."

The Rangeley Light & Power Company, the defendant corporation, was organized under the general law in 1908 for the purpose of furnishing electricity for light and power in the town of Rangeley and its immediate vicinity. This organization was confirmed and additional powers conferred upon the company by chapter 330 of the Special Laws of 1909. In the summer of that year, Dwight D. Elliott of Rangeley, who was an electrician, having some knowledge of the establishment of electrical plants, became president and general manager of the company, and arranged with Charles C. Benson, a banker and broker in Lewiston, the alleged trustee in these cases, to accept the position of treasurer. Extensive improve-

ments were in contemplation at that time and it was understood that the treasurer would take a prominent part in the management of the financial affairs of the new enterprise.

It is not in controversy that Benson had some negotiations with the president of the company with reference to the methods of providing the funds required to make the improvements that had been projected. It appears to have been estimated by the president that this expense would not exceed $22,000; but as the bills then outstanding amounted to $5000, it was deemed necessary to make provision for a total indebtedness of $27,000. It was accordingly arranged to issue bonds to the extent of $35,000 secured by a trust mortgage, in order to procure the required sum of $27,000 if practicable, from the sale of bonds of the par value of $30,000, and to hold the remaining $5000 of the bonds in the treasury for further improvements in the future. In pursuance of this plan the bonds were duly prepared, the mortgage executed and recorded, and the treasurer authorized by vote of the directors to dispose of the bonds. It does not appear that the price at which they were to be sold was fixed by this vote, but it seems to have been understood by all the parties that the price agreed upon by the directors was 90 cents on the dollar; and the plaintiffs in these actions contend, in accordance with the allegations filed by them, that these negotiations between President Elliott and treasurer Benson, who was doing business in Lewiston as a banker and broker under the name of Chas. C. Benson & Co. resulted in an agreement on the part of Benson that he would purchase $30,000 of the bonds at ninety, that pursuant to that agreement the bonds were delivered to him; that he paid for $11,000 of them, and that he was indebted to the Company for the balance of the bonds.

On the other hand Treasurer Benson insists that the negotiations never resulted in an unconditional agreement on his part or on the part of Chas. C. Benson & Co. to buy any part of the bonds; that the bonds were never delivered to Chas. C. Benson & Co., but were in his hands and possession as treasurer of the defendant corporation and were deposited and held in a safety deposit box rented by the corporation; that so holding the bonds as treasurer, and being authorized by the directors to dispose of them at ninety, he took $11,000 of them at that price and paid the amount into the treasury of the corporation; that the balance of the bonds there-

after remained in the safety deposit box of the defendant corporation, and that he never had possession or control of them otherwise than as treasurer of the corporation.

In support of the plaintiffs' contention that there was an actual sale and delivery to Benson & Co. of the bonds of the corporation of the par value of $30,000, President Elliott testifies that while the question of procuring the necessary funds for the construction of the plant was under consideration, Benson said to him in substance that he would personally "help him out on the bonds;" that on another occasion Benson expressly stated that "he would take $30,000 worth of the bonds and pay 90 cents on the dollar; that as he got on the train to return to Lewiston he said, "You understand this time I am only taking $30,000 at $27,000, and that he "signed and delivered to Mr. Benson $35,000 of the bonds," and has never seen them since. But he admits that all the conversation he ever had with Mr. Benson with reference to the purchase of $30,000 of the bonds for $27,000, took place before the bonds were signed, and that he never made any agreement with him in regard to the remaining $5000, in the event that $27,000 should prove insufficient. The plaintiff Kerr and Judson A. Record also gave testimony tending to show that Benson admitted that he was to take $30,000 of the bonds for $27,000.

In his examination on oath Benson states that upon the representation and assumption that $27,000 would be sufficient to pay for the improvements and the outstanding indebtedness of the corporation, he did undertake to aid in providing that amount of capital and expected to take bonds at 90 cents on the dollar for whatever money he furnished, but he emphatically denies that he ever made any contract with the defendant corporation to purchase any specific number or amount of the bonds of that company, and denies that he ever made any such statement to Mr. Elliott or any other person. He says that at one time President Elliott asked him to sign a contract to take the bonds, and that he refused to sign a contract and told Mr. Elliott that he would not obligate himself in any way to take any stated amount of bonds. He admits that he received $11,000 of the bonds as a purchaser at 90 cents on a dollar and used them as collateral security in raising $10,000 which he placed to the credit of the defendant corporation in his account as treasurer and disbursed the entire amount in paying the debts of the company,

with the exception of $2.06 which he had in his possession as treasurer at the time of the service of the trustee writs upon him. He further states that no other bonds were ever delivered to him as a purchaser, and that the balance of $24,000 remained in the safe-deposit box rented by the defendant corporation and have never been delivered to him or been in his possession otherwise than as treasurer of the defendant company.

It also appears in testimony that Mr. Benson in giving his reasons for not furnishing any more money, stated "that the proposition was going to cost $3000 more than Mr. Elliott had represented to him;  .   .   .   .   that he had made arrangements with the bank to furnish the money and take these bonds as collateral, and to furnish it as fast as the thing developed, and they had refused to furnish the money and consequently he should stop."

But the question presented for the determination of the court in these cases is whether Benson was indebted to the defendant corporation for bonds delivered to him as a purchaser by virtue of an absolute contract of sale upon which the corporation might have maintained an action for the price of the bonds. If Benson had agreed to purchase $30,000 of the bonds and only $11,000 of them were actually delivered to him, as a purchaser, his refusal to accept and pay for the balance would simply be a breach of an executory contract, which might afford a cause of action by the defendant company to recover unliquidated damages, but would not render Benson chargeable as trustee for the price of the bonds. His reasons for refusing to carry out such an executory contract would be obviously immaterial in the cases now before the court. But upon the question whether these bonds were delivered to Benson as a purchaser or whether they were delivered to him as treasurer only and thus legally remained in the possession of the corporation, the attitude of the plaintiff Kerr in regard to them after Benson had refused to accept any more than the $11,000 used by him as collateral, has considerable significance. Kerr testifies that he understood Benson to say that he had bought $30,000 of the bonds for $27,000, but after there had been a default in the payment of the balance of his claim, he employed counsel to collect it and it satisfactorily appears from the uncontradicted testimony of Mr. Benson that after being informed that there was no money in the treasury he endeavored to obtain some of these bonds, as the prop-

erty of the corporation, at fifty cents on a dollar, in payment of the claim. It is also worthy of notice that the $5000 of bonds which President Elliott admits were not sold to Benson do not appear to have been separated from the others but were delivered into the custody of the treasurer with the $30,000 alleged to have been sold, and remained in the Company's safe-deposit box precisely the same as the others. And finally it must be admitted that there is an element of improbability involved in the proposition that a business corporation would sell and deliver $30,000 of bonds on credit leaving the time and conditions of payment to be fixed by the purchaser.

It is therefore the opinion of the court that Benson acquired title only to the $11,000 of bonds which he used as collateral and for which he accounted to the defendant corporation at 90 cents on a dollar, and that at the time of the service of the trustee writs upon him, he was not personally indebted to the company for any bonds sold and delivered to him. It is admitted that the small balance of $2.06 was held by him as treasurer of the corporation, and a "treasurer cannot be charged as the trustee of his corporation for its property in his official custody for the reason that he is quoad hoc the corporation." *Donnell* v. *Railroad Co.,* 73 Maine, 567. The certificate in each case must therefore be,

*Trustee discharged.*